which is Plymouth County Retirement Fund v. Array Technologies. May it please the Court, Thomas G. Hoffman, Jr. of Labatton Keller-Suchero. We represent appellants, Plymouth County, and the Northern California Carpenters. I think we can all agree that we have to look at the alleged misstatements in the case from an ex-ante perspective. Your Honor recently discussed this in the Philip Morris case, citing the Seventh Circuit's opinion in the Palmer case. If I say I'm insured, that I have auto insurance, but I don't, my statement doesn't become false later on when I get into an accident. And it doesn't become true if I never get into an accident. That was an effective rhetorical point in your brief, but I guess I'm trying to figure out what is the statement that you think is the equivalent to, I have auto insurance? Specifically, Defendant Patel, Array CFO, flatly stated, Our contracts allow us to pass on these costs to our customers. And he emphasized, importantly, that that's an ability we know we have, communicating certainty about that fact. I mean, I guess that was my question. It's a little bit of pass on these costs to our customers. That seems to be a somewhat vague question that wasn't followed up on during the earnings call. It doesn't seem to be sort of terms of art. You seem to say that the only way to interpret this is that it talks about the ability to basically renegotiate contracts that you've already entered into. I think that there was some confusion about that from the district court, but let me again point to the statement, which is our contracts allow us to pass on these costs. And so we believe that Defendant Patel is talking about a contractual right to be able to pass on costs to the customers. And that gets a little bit muddy and confused, we believe, in the district court's decision. Because there is some talk about renegotiation of customer contracts, but that is not- Yes. It's not, I don't know that it is as clear as you suggest. Yes, Your Honor. First, what Patel actually said was, quote, we're always evaluating our pricing on our projects, and we know that we have that ability, and we'll look into it on a case-by-case basis. So again- That was in response to the second half of the question, which was about passing it on to customers, right? That's right. And he says, we know we have that ability. Again, talking about the contractual ability to pass on those costs to the customers, he didn't say we have that ability on a case-by-case basis. He said we have that ability. But in context, your position is that he was flat-out lying when he said the earlier statement, and knowingly lying. I cannot tell you if he was knowingly lying or not, Your Honor. He was at least reckless with respect to his statements, because- I want to pause on that, because it seems to me, I think you've identified what is sort of the worst statement, and that's Patel's earnings call statement. But what about Sienter, then? So that's where Judge Chin sort of teed that up. But what is there to indicate that he knew what the contracts were, or that he had firm knowledge as to what the contracts allowed or didn't allow? I didn't see anything in the complaints or in the five-page letter seeking to amend. To plead Sienter based on recklessness, which we would submit that Defendant Patel is at least reckless, plaintiffs don't need to allege fraudulent intent. We only need to allege that defendants knew facts or had access to information suggesting that their public statements were not accurate. That's from this court's decision in Blanford in 2015, which we do cite in our papers. Here, Patel was at least reckless with respect to these pass-through statements, especially when he underscored the point by asserting, we know we have that ability, thereby communicating certainty to the market. He was wrong, and I can give you our best evidence for that. But if he did not know that as he represented, then he was at least reckless in making those statements. And he was wrong. But the evidence that he's wrong that's in the complaint is what? Correct. The facts alleged in the complaint that that's wrong is what? If I get across one thing today, I would exhort this court to please look at paragraph 97 of the complaint, which is an important paragraph that talks about Defendant Fusaro, the CEO's post-class period admissions, about Array's contracting process and what it was during the class period and how it was changed after the class period. Defendant Fusaro, which is corroborated and confirmed by CWs, we also cite in the complaint. So specifically, let me point to paragraph 97. Again, Fusaro belatedly admitted, he says, historically, we would agree to a price with our customers when they would award us the project. In other words, Array and its customers, they entered into a fixed price contract. This is corroborated by CW6, who was a program manager at Array throughout the class period, and who explained that Array's customer contracts were written in such a way that Array was locked into the pricing, meaning that, quote, prices were fixed, end quote, from CW6, and Array had to absorb any price increases. Again- Can I ask you a question about that? The district court, as I read it, seemed to understand the proposed additional allegation from CW6 as saying that many of our contracts were fixed price contracts. Was that the allegation that you proposed to add from CW6, many of our contracts? That, I believe, is from CW4. There's CW6, 7, and 4 in the amendment. CW6 and 7 are new CWs. CW4 is one that we were able to go back to and get additional information. So the question I have, though, about CW6 is whether that was an across-the-board statement or whether it was qualified. That, again, goes back to the distinction between pass-through ability in the contract or the ability to renegotiate the contract, basically the concept of efficient breach. CW4 did state some of the contracts could not even be renegotiated, and that's where CW4 says they were written in stone in the contracts. But, in other words, Array might have the ability to go back and renegotiate some of the contracts, but there's no indication that any customer contracts gave the ability, the contractual right, to pass on costs to the customers. That just clearly did not exist. If you look at Fusaro's post-class period omissions and confirmed and corroborated by the CW statements, I'll go back to paragraph 97 of the complaint. Fusaro said that Array bore the risk of commodity price movements for 90 days after contracting. I'm sure you'll remember this 90-day time period where Array bore the risk. He says, the process of finalizing the design and generating the bill of materials could take up to 90 days. The result was that if input costs moved down during that period, our expected gross margin on the order would increase. And he says, and if they moved up the costs, their margin would decrease. That's a quote from paragraph 97. Right, well, I mean, that's basically Econ 101. The issue is whether or not they had the ability to pass on the costs, right? That's right, and all of the evidence, your honors, is that they did not have the contractual ability to pass on the costs. There were also other statements throughout about the risks. Significant price changes for these raw materials could reduce our operating margins. In other words, at the same time, they're saying that these price increases could have an impact. And so perhaps this, again, goes to the Sienta question. I mean, where's the Sienta? Well, as a matter of fact, your honor, it's pointing to the purported risk disclosures that we say are themselves misleading. Because they referred to rising costs may impact Array and could reduce the company's margins if we are unable to recover such increases from our customers. That we allege was a materially false and misleading statement in itself. Because at the time, Array clearly from the beginning of the class period is already being impacted by rising costs. It also disclosed that prices had gone up throughout. And as Array argues, it was a matter of public knowledge. The increasing costs, your honor, apologies for interrupting you. But that was public knowledge. The prices of steel were public knowledge at the time. And the increasing prices of freight, all of those things were public knowledge. And that's how I'd like to go back to the CWs and our evidence of falsity. But if you look at it holistically, there was a stock drop of 46% at the end of this case. Now under Dura, we all know that a stock drop does not create a fraud. But a 46% stock drop in one day does indicate that investors were surprised by something. Indeed, I would say shocked. They were not surprised by those rising prices, your honor. The rising costs of freight and steel were public knowledge. And defendants admit this in their papers. What they were surprised by was the impact on Array. And it goes back to those statements about the pass-through. If it was true that they could pass through the costs on their customers, then it wouldn't have that impact on Array. And this importantly is reinforced by the analyst statements at the end of the class period. And the analyst statements at this pleading stage, they're a proxy for market sentiment and what the market believed. But all the earnings, I mean, all the analyst statements say is that they were surprised. It doesn't really say why they were surprised. That's kind of the problem, isn't it? They do say why they were surprised, your honor. I would respectfully push back on that and say the Morgan Stanley analyst said Array, quote, is experiencing steep increases in steel and freight costs and the company is less insulated than we previously expected. He's referring to we, Morgan Stanley. And what's the basis for the prior expectation? That's my point. I don't know why the analyst had those prior expectations, whether it's based on something in the written materials, whether it's based on earnings call statements, whether it's based on something else. Well, clearly they did have. The analyst report doesn't say, right? It doesn't specifically point to Patel's statement, but there were at least three analysts that say they expected that Array was insulated. Morgan Stanley, who I just said, said the company is less insulated than we previously expected. Cowan stated, quote, this aspect of the business is likely a surprise to investors relative to initial positioning. We also have a statement by Roth Capital Partners on February 2021 that the company, quote, adopted an approach to its contracts that limits its exposure to steel prices and passes the risk on to customers. End quote. That is almost word for word what Patel was out there saying. Defendants point out that that particular analyst report actually came before Patel's pass-through statements. We don't know exactly where that came. Obviously, there was an IPO. There was an analyst day. Somebody gave him that information. But there's three. We did facts, though, right? It was a private statement, and we're not alleging that as a false and misleading statement. However, I point this out in response to Your Honor's question because there are at least three analysts that absolutely do talk about this exact issue and express surprise, saying that they were surprised and that they think investors would be surprised. And this is the pleading stage, Your Honor. And so we would submit. But you have to plead more than that analyst were surprised. You have to allege facts and you don't need to allege. And we do. And I would go back again to that important paragraph 97 because Fusaro went on to explain exactly how these contracts worked and how Array bore the risk of increasing prices during that 90-day period before they locked in commodities prices. Fusaro said he actually claimed that this was working for Array until during the class period. Fusaro stated that changed in early April. Of course it worked for them. I mean, if you don't hedge and they don't hedge. They weren't hedging. If you don't have a lot of inventory, which they don't have a lot of inventory, then declining steel prices, of course, are going to increase your margins. That's right. And rising steel prices are going to increase your margins unless you can pass through the cost to somebody else. As Your Honor said, that's Economics 101. But again, then Fusaro explained importantly how they changed their contracting process at the end of the class period. And he goes on about this in great detail. He says during the second quarter, this is 2021, this is after the class period. He's speaking in August of 2021. So three months or so after the class period. And he says during the second quarter, which of course starts in June. The class period here ends in May. He says during the second quarter, we took action to close that gap by changing our business process. Today, if a customer wants a fixed price, we offer two options. And he goes on to describe how they can offer them a price that's good for 30 days with collars around the price. Or they can only give them a contract with a price that's good for seven days. In other words, they changed their contracting process to fix this problem and to give the company the insulation that they claim to have had during the class period. But they did not have. And this, again, is corroborated by the CWs. CW's statement from CW6 said after the class period, Array implemented new language to their contracts that allowed for increased costs of materials to be passed on to Array's customers. CW7, who I mentioned, who was a senior manager in the program management office during the class period. He said that in response to rising costs, Array made changes to its customer proposals after the class period. And he goes on to describe exactly what Fusaro was talking about in his post-class period admission in that paragraph 97. CW7 specifically said Array made at least two changes to its proposals to customers. One was a shorter time limit on how long the price in the proposal was good for. And the other was an inflation clause, which stipulated that the price to the customer would increase if Array had been subjected to increased costs on the company's end from their suppliers. That's a quote. So together, these contract revisions after the class period gave Array finally the insulation that it claimed to have had during the class period. I would submit that in the face of the post-class period admissions, in the face of the CW statements that confirm and corroborate that, in the face of the stock drop, which is relevant, and in the face of the analyst commentary, this is all powerful contemporaneous evidence of what the market knew and how it interpreted the alleged misstatements. And in the face of such evidence, we believe a court should not substitute its own opinion regarding what investors knew or how they should have interpreted the alleged misstatements. And we submit that's what the district court did here, and he made other factual and legal errors. We talked about- We're way over. We haven't talked about item 303, but you've got two minutes for revolve, unless either of the judges have a question. Thank you, Your Honor. Okay, thank you, Mr. Hoffman. We'll hear from Ms. Bebchik. Bebchik? Good morning. May it please the court. Lisa Bebchik on behalf of appellees. The court should affirm the district court's decision in its entirety. This was a thorough 58-page decision that identified numerous pleading defects. The ruling was correct on all counts. I'll turn first to the pass-through ability, which was the subject of the majority of the prior discussion. Plaintiffs are trying to characterize Mr. Patel's statements as categorical statements that the company was fully insulated from commodity price increases. That is not the case. Mr. Patel made statements on an earnings call, and it seems like Your Honors have read the entirety of that earnings call, but if you haven't, I would encourage you to do that. Plaintiffs are cherry-picking a portion of one statement and saying that that statement was false, but what Mr. Patel was conveying during the earnings call was that they had an ability to help manage the commodities price increases and that they would evaluate that ability on a case-by-case basis.  What he says is that Array's contracts allow it to pass on these increased costs to its customers. So how do you square that with Fisaro's later statement? With Mr. Patel. What is there to suggest that Array, in fact, had the ability to pass on these costs to its customers? So there are several things that show that Array, in fact, had that ability. As my colleague pointed out before, after they withdrew guidance, they went back and actually adjusted pricing on the contracts. And, in fact, in every risk disclosure, they had a statement that said they had risk if they were unable to pass. It's a simple question. What is there that suggests that the contracts allowed them to pass on the increased steel prices to its customers? I mean, it seems to me that what Fisaro is saying is that going forward, we're now going to write contracts that way. But there's nothing to suggest that they previously wrote them that way. And I guess the CWs that are now referenced in the post-dismissal letter will go even farther to say that there were no such contracts before. So I guess that's what I'm having trouble with, how you're going to square Patel's statements as something innocuous. Well, Your Honor, the revisions that were made to the contracts was just to shorten the time period where there was exposure. No, it wasn't just to shorten the time period. It's also, it then sets what are described as collars. In other words, that if steel prices go up a certain amount, well, then we get to renegotiate, right? That's right. But the ability to, the statement was a general statement. It said that the company had the ability to. The contracts allowed it to do this. That's what it said. Right. In other words, when they went back and renegotiated prices, Your Honor, after the class period, that wasn't something that. And they were successful at that. You're saying that Fasaro's talking about renegotiating contracts? He seems to be talking about our practice in contracts going forward. He doesn't seem to be suggesting that there is an ability to renegotiate contracts that have already been executed. Am I missing something? Can I focus specifically, and I'm sorry, I think we're asking the same question. It may be that there are different comments that's causing this confusion. Sure. I'm looking on A947. I'm looking on the March 9th analyst call. And this is not even in response to questions, because I understand sometimes in response to questions, things can get a little garbled. I know I get garbled in response to questions. But there are three reasons given for the guidance reflecting lower margins in the prior year. And the third was, finally, commodity prices and trade costs have increased significantly. And in the context of talking about that, he says, while we expect prices to normalize and our contracts allow us to pass on these costs to our customers, we've taken a conservative approach, blah, blah, blah. So my question for you is, our contracts allow us to pass on these costs to customers. That's a factual assertion. That's not a projection. It's not an opinion. Was that true on March 9th, 2021? Yes, Your Honor. I would say that that wasn't a categorical guarantee that they would be able to pass along costs to customers. That their contracts allowed them to seek to renegotiate the price while there was a period of time where the price wasn't fixed in the contracts. And you think that the statement that I just read you communicates what you just said? Well, I think you have to look at the entirety of the earnings call, because this comes up repeatedly on the earnings call. And as Your Honor pointed out, Mr. Patel then goes and says that they will do this on a case-by-case basis. And the analysts appear to understand that, because they ask questions along the lines of, well, are you, you know, when are you going to, like, how high do prices need to get before you're going to go back to the market to negotiate these prices? And we're talking a lot about this statement by Mr. Patel. And I would just point out that, let's assume you find that this statement was false. As Judge Sullivan pointed out, and I don't believe it is. I think it's general. I think it was qualified by the case-by-case statement. You said a moment ago that the contracts allowed them to seek to renegotiate pass-throughs. That would suggest the contracts didn't allow it. That's why they would need to renegotiate it. No, I think that I would look at it that customers aren't going to just out of the goodness of their heart agree to change their prices. The contracts permitted this, the price to be renegotiated and allowed. There were provisions to that effect. Yes, Your Honor. So you're going to say, assuming it is false, your next point was going to be about Sienter. Yeah, I mean, it's twofold. I want to talk about Sienter because I think that's really important. But I also want to focus on the fact that these statements by Mr. Patel, even though plaintiffs are trying to allege they, there are three offerings here, two of which are in 2020, and the third of which is in 2021 when these pass-through statements were made. So they don't have any bearing on the first two offerings. And plaintiffs have done nothing to plead Sienter here, let alone a compelling inference of Sienter. And the burden is greater than under a motive theory, which they've abandoned. They have to show conscious misconduct or recklessness. And they're relying on these CWs, the majority of which were not employed during the class period. They can't speak to Mr. Pissarro or Mr. Patel's Sienter. Yes, but I think the argument is for a corporate officer in an earnings call to expound upon what the contracts allow them to do to recoup the rising costs of steel, that that is the sort of extreme departure from the standards of ordinary care that most CEOs wouldn't do or CFOs wouldn't do. Yeah, I guess that's really, I think that's their theory. I guess I'd like to hear the response. Yeah, the response to that is, is they've cited no case. And I'm not aware of a case where isolated statements on one earnings call is sufficient to establish Sienter in the cases they cite in there. It's a statement that says our contracts allow us to do this. And so if the contracts emphatically don't allow them to do that, is that the kind of extreme departure that is enough to prove Sienter? That's really the question. I don't think it matters that it's one earnings call or multiple earnings calls. It's whether making an emphatic statement about what contracts allow without even consulting those contracts is enough to establish recklessness for purposes of Sienter. And, Your Honor, the contracts did permit the company to pass through costs. Just not in every instance. They're alleging that they didn't. They're saying that Fisaro's statement a few months later suggests that they didn't. And now they've got a CW, I think, that they want to use in the amended complaint, who's going to say that the contracts emphatically didn't allow this. So why isn't that then a factual question? But what the CWs that they want, that they raise in their request for leave to amend actually say is that some didn't allow, but others did. And the fact that they were able to change the price in a significant number of contracts at the end of the class period, I think, contradicts. I mean, those CWs all say some. None of them say all. Well, part of the problem is that it depends on which question you're asking. There are three different things that a contract can do. It can have a fixed price that is set in stone, and you can't come back and try to renegotiate. You can come back and try to renegotiate and maybe lose the contract, right? Maybe the contract goes away because they're not able to reach a meeting in the mines with the new prices. Or there's pass-through. Literally, as steel prices go up, the contract price that people have agreed to goes through. If the Patel statement is understood as saying our contracts are in the third category, there's nobody that I'm seeing that suggests there's any contracts that were in that third category. The CWs are saying that some are fixed in stone. Some might have the ability to come back and try to renegotiate, and if you can't renegotiate, then you lose the contract, which would also have implications for the earnings of the company. But is there any CW who leaves the door open to the possibility that there are – that the contracts don't allow – I'm trying to not do a double negative, and I'm triple negating myself. Can you tell me how we could interpret the CW allegations as anything but there are no contracts that allow direct pass-through? I don't think the CWs actually say that. Plaintiffs say that repeatedly, and I think it's an overstatement. The letter – I mean, we don't have anything on CW-6 besides what's in the letter, I suppose, and it's their characterization. But they're saying CW-6 explains that these contracts were written in a way that the customers – that array was locked into pricing, meaning prices were fixed. So what's your basis for saying that this CW is saying that there's some that were fixed and some that weren't? Looking at what CW-6 says – In the letter? Yes, in the request for leave to amend. I mean, he's just – he's talking generally that array had poor contracts that were written in a way. I don't think he's talking with a level of precision that every single one of array's contracts. And in fact, CW-7, I believe, says – or might even be CW-6 as well – says some or many. But, Your Honors, I think it's really important to go back to Sienta here, because this pass-through comment, again, is only relevant to the 34-act claims here. And I hope I have time to talk about the risk disclosures, because what you haven't heard from my colleague is, as to the risk disclosures, they argue they created a misimpression that steel and freight costs posed a hypothetical risk when those risks had already materialized. And you heard that again this morning. But they don't articulate a materialized risk. They point to none. There are three offerings here. As to the first two, it's undisputed that array met and exceeded its guidance in 2020. This was a company that was navigating challenging turmoil in the market as a result of COVID-19. You also don't hear about that context. And they don't challenge that guidance at all. And as to the third offering, array disclosed that its assumption was that prices would moderate in the second half of 2021. Plaintiffs don't challenge that assumption as unreasonable either. And that's critical. That was disclosed in the very statements they're challenging as false and misleading. If a trend is underway and it's happening and you think that it's going to end, your view is you then don't have to disclose it? Disclose it? No, my view is- Under item 303? Yeah, I would describe this more, Your Honor, as an uncertainty. And that uncertainty was absolutely disclosed and disclosed ad nauseum by the company. And actually, in the context of the earnings call we were just discussing, the company's not presenting an overly rosy, optimistic picture of the market that they're navigating in. They're telling the market that we have risk. They're saying there's uncertainty related to COVID. And I believe they satisfy their item 303 disclosure obligations by making adequate disclosures regarding these uncertainties that the company faced. What wasn't there was a known trend that was reasonably likely to have a material impact on the company. As I mentioned, they had met guidance in 2020, despite these challenging times, based on the very practices that the plaintiffs are challenging as inappropriate. And they had disclosed the fluctuating price of raw materials, the uncertainties as a result of the COVID-19 pandemic. And again, they beat guidance. And plaintiffs don't state what that material- How much does beating guidance matter? I mean, they beat guidance. But there might be a lot of reasons why they beat guidance, or they might have beaten it more, but for certain things they didn't disclose. I mean, is that- do you think beating guidance is a magic cure to an item 303 allegation? Well, I do, because I think it goes to whether the determination of whether there is a trend reasonably likely to have a material impact. And the company, using the same business practices they're challenging here, holding the- Well, but you could beat guidance because the first couple of months were great because steel prices were really low. It seems like a lot of their margins had nothing to do with their products. It had to do with the market for steel. When the market is down, then they're recouping a lot of money because their margins go way up. But because they don't hedge, they're at risk more than companies that do hedge when the prices go up. Right, and that's why the practice that my colleague was talking about before, where they held- where they had 90 days before the price was determined, was historically helpful for the company, because historically prices would come down in that period, and that was helpful. But during this tumultuous time we're dealing with, when these offerings are happening, where you have COVID-19, you have the closure of the Suez Canal, you have all this uncertainty, the business practices that they had been using helped manage to get them through 2020, exceeding their guidance. And they had confidence going into 2021, but they still- which I think makes this case really unique- they still disclosed to the market, we're basing our assumption on the fact that steel prices will go down. And that was a widely held assumption. It's cited in the complaint, the Monarchs Metal Report. The industry held that assumption too. So from an item 303 perspective, where they had a reasonable basis to believe that steel prices were coming down, there was no known impact on their bottom line, because they're coming off of that earnings beat, and that's giving them the confidence going into 2021. Well, what's strange about the statements before the IPOs is that they acknowledge they don't hedge. And so that is signaling to the market that we are much more vulnerable to changes and fluctuations in the price of raw materials than those who do. But I guess, do you think item 303 requires then somebody who's doing an IPO to say, we've got a 90-day period in which we do contracts as opposed to a 7-day or a 30-day one? I don't, Your Honor. I think that that's not required under item 303. I don't think that's required under the securities law. Do you think it's required under 303 to say whether you hedge? I don't, but here the company disclosed that very clearly. No, I know. I'm just trying to figure out what are the parameters of item 303, which frankly has never been clear, and I don't think the SEC wants it to be clear, candidly. I think they want to keep everybody guessing and think that that will enforce better conduct. That's generally their MO. But I'm just trying to figure out what things you need to, and I'm going to ask Mr. Hoffman the same thing. But a hedging statement doesn't need to be in there. The details about the contracting process, whether it's 90 or 30 or 7 days, the particulars of a contract, those are all things you think that are beyond the scope of item 303. Yeah, I do. I think, look, it's very case-dependent, but here the question is, is there a known trend reasonably likely to have a material impact? Or a trend or uncertainty. They disclosed the trends or uncertainties. The issue is what could they, what should they? What they don't explain is why it's even more profound than it might otherwise have been. So if you just have a statement that says we make stuff with steel, we are at the mercy of the steel markets, and so those things can affect our margins. That's great. But that's, it's even more true if you don't hedge. It's even more true if you don't keep a lot of inventory. And it's even more true if you have 90-day contracts or 90-day windows in which you're, you've settled on a price but you still haven't negotiated your steel. So I'm not sure what the answer is here, but I think it's, it does require us to sort of say, what are the limits of an item 33 disclosure? That's not really a question. All right. Well, you're way over as well. We will now hear from Mr. Hoffman for a couple of minutes. Thank you. Thank you. Just a couple of factual points first, which is on the renegotiation of the 100 contracts the district court credited Patel's pass-through representations saying that Array did have that ability because they were able to renegotiate some contracts. The company said they felt good about half of them. They were less good about some other ones, but that just proves that they didn't have the contractual right to pass on increased costs to its customers. Paragraph 95, we talk about an analyst report that describes the Herculean exercise that the company had to go through to renegotiate those contracts. That's something that investors would not have understood from Array's statements. Regarding the 90-day period, the district court just made a factual error that I want to point out. They said Patel's statement about Array's typical order pattern during Array's March 2021 earnings call disclosed the allegedly concealed information, but the district court just got it wrong. He was talking about a different time period between the ordering of the material and delivery to the customers. He wasn't talking about the 90-day period we're talking about, which is when the company bore the risk, which was a different 90-day period between the award of the contract and then the locking in the prices for the material. So that was just a factual error. To put that aside, counsel referred to the tumultuous time of COVID. That cuts both ways. That's exactly why investors were so interested in this information and analysts repeatedly asked about it. At page, talk about impact, and this goes both to the risk warnings and item 303, Your Honor. At page 31 of their appellate brief, defendants argue they disclosed, quote, rising steel prices were impacting Array's costs. They can't have it both ways. They can't say we told the world that this was impacting Array's costs, and yet there really was no impact. They can't have it both ways. There was also a delayed impact, and this made it even worse due to the 90-day window before it actually hit the bottom line, as Your Honor was discussing. Because they held that risk for 90 days, there was a bit of a delay, but there was impact. In fact, in November 2021, Array disclosed that they went from margins, its gross profit as a percentage of the revenue, decreased from 19.2% to just 4.8%. And importantly, Array's earning presentation from that August earnings call contained a chart showing that the impact of Array's legacy contracts, i.e., those contracts that did not allow it to pass on increased costs to customers, the impact on the margins would continue until the second half of 2021. And there's a chart on that in the complaint that's reproduced at page 31 of the complaint. And finally, just to briefly discuss item 303, I know I'm going over time, but I don't think we have the burden necessarily to rewrite the defendant's disclosures, but certainly here they had to disclose more. Their may and if statements, may and if, were just incredibly vague, and investors would not. All they're basically saying is increased prices may affect our margins unless we can increase what we charge our customers. That is also Econ 101. What about the statement suggests that that's similar to what Patel said in March? They strike me as very different statements. I thought you were preaching to the choir for a second there, Your Honor. No, no, I'm not preaching to the choir. I think you're asking a slightly different question. You're saying that item 303, it was false to say that significant price changes for these raw materials could reduce our operating margins if we are unable to recover such increases from our customers. That strikes me as just basically if costs go up, margins go down unless we can increase prices. So what? The standard is, you know, it's materially false and misleading. And what we say with respect to the disclosures and the purported risk warnings here is that it is misleading to say rising costs may impact array and could reduce the company's operating margins if we are unable to recover such cost increases where they very well knew they couldn't pass on these costs to their customers. Yes, they can renegotiate their contracts. Anybody can do that anytime. That's efficient breach of contract. But this in light of the increased risk that investors did not understand that the company was gambling on this 90-day window. You're saying they had an obligation to disclose that they have a 90-day process? Not necessarily, Your Honor. But they did have the duty to disclose, first of all, that they were currently being impacted as they admit now. They absolutely were being impacted. I just discussed impact on the margins and impact on the profits. So they should have said we are being impacted by rising costs. That was true from the beginning of the class period. And they should have misleadingly said. The IPO is basically two months after prices have started going up. You're saying that's a trend? A two-month increase is a trend that has to be disclosed? There was a very large increase. Again, in another chart in our complaint, before the IPO, it was the COVID context. And prices were steadily increasing, not only before the IPO, between all of the relevant offerings in this case, and then beyond. So, yes, the trend did start earlier than the IPO, 100%. Well, I guess the point is, how long does it have to be going before it's a trend or a recognizable trend? Well, I think it was something like a 30% increase even before the IPO. That's a very large increase in itself. And so if it was a one-month 30% increase, that is something that would have to be disclosed? It depends on the magnitude, I think, Your Honor. But what item 303 requires is there must be a trend or uncertainty. So here there is a trend or uncertainty. We all admit that. The risk was disclosed. It has to be known to management. They now admit it was known to management. There has to be a reasonably expected impact. I think the district court erred when it said that the company did not reasonably expect steel prices to keep rising. As noted on page 31 of their brief, they knew that prices had already impacted the company. And steel prices were uncertain and trending up throughout the entire class period between all of the relevant offerings. One of the things I was trying to figure out about that, because I gather your critique is that they used could, if. Sort of a future conditional tense when they should have said are. Absolutely. If the company believed, and, you know, in retrospect, we know that's not how things unfolded. But if the company believed that the rise was more temporary than it turned out to be, and then on the backside of the hill, the company was going to have the upside of that 90-day wait with respect to a tranche of contracts, just as it had the downside for the ones that hit during the rise up, wouldn't the future conditional be a reasonable way of expressing the risk without overstating the actual damage? I think there are two answers to that. There's one answer for the Exchange Act and one answer for the Securities Act, frankly. For the Exchange Act, I think it fits into the pattern, at least for Fusaro and Patel, of this active concealment of the inability to pass on costs to the customers, which is mentioned in the risk disclosure. And for the Securities Act, of course, there is no scienter requirement. The only requirement there, and the only requirement for Item 303 is that it's a trend known to management. So there's a tiny scienter requirement there. But that's all that's required for Item 303. So I guess there's technically a couple of different answers to that. But given the context of all of the context that we've discussed today, I believe that we have pled, at least, that an impact was reasonably, it was already there, and it was reasonably expected to continue. My time is up. Unless you have any other questions, plaintiffs respectfully request that the court reverse or at least vacate the district court's motion to dismiss order and remand the case with instructions to grant plaintiffs leave to amend. I just have one question. Do you think Item 303 requires any manufacturer who relies on commodities like steel to disclose whether or not they hedge to protect against rising steel prices? I think, Your Honor, that it really depends on the facts and circumstances. I know that doesn't make your job easier. Anybody who manufactures something with steel, like these guys? These guys did. That's my answer. That's my answer, and I realize that doesn't help you in giving guidance to the district courts. Thank you both. We will reserve decision.